# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2617 | **DATE** | 2/19/2002 |
| **CASE TITLE** | U.S.A. ex rel Gary Duncan vs. Williams D. O'Sullivan | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, we deny the Section 2255 petition [1-1] for a writ of habeas corpus brought by Petitioner Duncan. This is a final and appealable order. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 26 2002 | |
| ✓ | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | TSA courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES OF AMERICA ex rel.    )
GARY DUNCAN,    )
    )
    Petitioner,    )   No. 99 C 2617
    )
   v.    )
    )
WILLIAM D. O'SULLIVAN    )
    )
    Respondent..  )

DOCKETED
FEB 2 6 2002

## MEMORANDUM, OPINION, AND ORDER

This case is before the Court on the petition of Gary Duncan for a writ of habeas corpus

pursuant to 28 U.S.C. §2254. For the following reasons, we deny the petition for habeas corpus.

### BACKGROUND

Petitioner does not challenge the statement of facts set forth in the order of the Illinois

Appellate Court affirming his first degree murder conviction. People v. Duncan, No. 2-94-0675

(Ill. App. Ct. May 31, 1996). For purposes of federal habeas review, "a determination of a

factual issue made by a State court shall be presumed to be correct." 28 U.S.C. §2254(e).

Accordingly, we will adopt the facts as our own.

On January 26, 1994, Petitioner was indicted for first degree murder in the January 7,

1994 death of Eric Stark, the 16-month old son of Petitioner's girlfriend, Pamela Stark. Prior to

the trial, Petitioner filed a *motion in limine* seeking to exclude from evidence the autopsy

photographs of the victim. The trial court denied Petitioner's motion. However, the trial court

agreed to review each photograph before submitting it to the jury and to ask each prospective

juror if she had any problems with viewing graphic photographs. The trial court excused for cause two jurors who responded affirmatively to the question.

Pat Turner, a registered nurse at St. Therese Medical Center, testified that on January 7, 1994, Petitioner came to the emergency room with an infant, Eric Stark, who did not appear to be breathing. Turner demonstrated the technique used to perform cardiopulmonary resuscitation (CPR) on Eric. Turner testified that as they were performing CPR on Eric, she and Dr. Richard Romolo noticed that Eric had old and new bruising all over his body. She stated that Eric had bruises on both of his eyes, the left side of his head, his abdomen, and his testicles. Turner testified that Eric also had an extremely swollen abdomen.

Turner further testified that as she and Dr. Romolo were examining the bruises on Eric, Petitioner stated, "Okay, I will tell you, I did it." Turner asked Petitioner, "What did you do?" Petitioner replied, "The baby wouldn't eat, so I shoved food down his throat and he stopped breathing."

Dr. Richard Romolo testified that Eric Stark was not breathing and had no vital signs on January 7, 1994 when Petitioner brought him to the St. Therese Medical Center emergency room. Dr. Romolo also testified that he and nurse Turner unsuccessfully attempted to revive Eric and that Eric had bruises of varying stages all over his body.

Adam Robertson, Petitioner's cousin, testified that on January 7, 1994, he lived with Petitioner, Pamela Stark, and Pamela's two children, Jamie and Eric Stark. Robertson testified that Petitioner watched the children during the day while Pamela was at work. Robertson told the court that from January 2, 1994, through January 7, 1994, Eric was ill with vomiting and diarrhea.

2

Robertson stated that, on January 7, 1994, Petitioner awakened Robertson and told him that Eric was not breathing. Robertson scooped cereal from Eric's mouth and performed mouth-to-mouth resuscitation and the Heimlich maneuver on Eric. Robertson stated that he used an amount of pressure suitable for the baby and then rushed Eric to the St. Therese Medical Center emergency room with Petitioner.

Robertson testified that he had seen Eric with just a diaper and a shirt and that he saw no bruises on Eric's body. Robertson also stated that Eric was afraid of Petitioner and that Petitioner said that he did not like Eric because he was not a cute baby. Robertson then testified that Petitioner had told him Eric had fallen out of a truck one month before his death and that Eric had hit his head on a table three weeks before that. Robertson testified that Eric's head was swollen and blood vessels in his eyes had "popped" as a result of these incidents.

Officer James McCarthy told the court that he and his partner, Officer Mormino, transported Petitioner from St. Therese Medical Center to the Waukegan police department. After reading Petitioner his Miranda rights and having him sign a written waiver of those rights, Officer McCarthy interviewed Petitioner about the death of Eric. A written version of Petitioner's statement was admitted into evidence as People's exhibit No. 32.

Officer McCarthy testified that Petitioner stated Eric had been involved in an incident in the middle of December 1993 in which he fell out of a truck and injured his head. Petitioner stated that a doctor told him that the large soft area on Eric's head was blood under the scalp that would eventually drain and cause his eyes to swell and blacken. Officer McCarthy told the court that Petitioner had told him Pamela had wanted to take Eric to a hospital at the time of the incident, but that he had talked her out of it because he was afraid the Department of Children

3

and Family Services would take Eric away from them due to the bruises on his body. Petitioner denied being responsible for those bruises but felt he would be blamed for them.

Officer McCarthy testified that Petitioner stated that on the morning of January 7, 1994, he awoke and checked on the children. At that time, Eric was awake. Petitioner then told Officer McCarthy that he took Pamela to work, returned home, and attempted to feed Eric some cereal. Because Eric would not chew his food immediately since his fall from the truck, Petitioner forced several spoonfuls of cereal into Eric's mouth and waited for him to swallow. After three spoonfuls, Petitioner left him alone and went into the other room because Eric was not chewing. A few minutes later, Petitioner returned and found Eric on his side, gurgling and his ears turning blue. Petitioner woke Robertson and told him about Eric's condition. Robertson performed CPR on Eric, and they took Eric to the emergency room.

Officer McCarthy testified that he questioned Petitioner about the bruises on Eric's body. Petitioner stated that the head bruises were from the fall from the truck in December. The other bruises were because Eric was clumsy and always running into things. Officer McCarthy asked Petitioner if he ever hit or disciplined Eric. Petitioner replied that he had spanked him with his diaper on. Petitioner denied striking Eric or causing the injuries to Eric's testicles.

However, Petitioner admitted that he knew that Eric was afraid of heights. Petitioner said he sometimes would hold Eric up high and spin him around until he was dizzy, or hold him upside down by the ankles. Petitioner also admitted that he would place Eric on the kitchen counter because Eric was afraid of heights. Eric would shake and cry, but Petitioner would not take him down until Robertson or Pamela took him down.

Petitioner also described two "games" he played with Eric called "Pancake" and "Happy Birthday." "Pancake" involved Petitioner placing Eric face up across Petitioner's knees and

4

inflicting "karate chop" type blows to Eric's stomach. Petitioner admitted that Eric disliked this, and Petitioner stated that he stopped after Eric fell from the truck.

"Happy Birthday" involved Petitioner holding Eric as high as possible by the ankles, upside down, and bouncing Eric's head on the bed or the couch. If Eric cried, Petitioner would continue until Eric stopped crying. Pamela told Petitioner to stop this game, so Petitioner thought of another game in which he held Eric upside down as high as possible and dropped Eric on the bed. Once during this game, Eric fell off the bed, injured his head, and had to be taken to the hospital.

Officer McCarthy testified that Petitioner said he did not intend to hurt Eric or do anything to cause him to die. Petitioner stated that all he was trying to do was toughen Eric up so that he would not be a "momma's boy."

Officer Fernando Shipley testified that he questioned Petitioner regarding Eric's injuries and death. Petitioner related the same account of the events he had related to Officer McCarthy.

Officer David Yarc testified that he questioned Petitioner regarding Eric's injuries and death. Officer Yarc's questioning was recorded on a videotape which was admitted as People's exhibit No. 35. During the questioning, Petitioner related the same account of the events that he had related to Officer McCarthy.

Peggy Stark, Eric's grandmother, testified that her daughter Pamela Stark, and Pamela's two children, Jamie and Eric, lived with her until November 1993. Peggy testified that when the children lived with her, she and her daughter Amy would care for the children while Pamela was at work. Peggy testified that she never saw any bruises on Eric while he lived at her home. However, he did have scrapes on his shins from falling while learning to walk. Also, he had

fallen and hit his chin on a coffee table. Peggy testified that she removed the table from her home after that incident.

Peggy testified that in November 1993, Pamela and her children moved in with Petitioner. Peggy stated that, on December 19, 1993, she noticed that Eric's head was swollen and bruised. Peggy testified that Petitioner told her that Eric received these bruises when he fell out of Petitioner's truck.

Peggy told the court that she noticed bruises under Eric's navel and that one of his testicles was swollen three days before Eric's death. She testified that Petitioner told her he did not know what had happened when she asked about the injuries. On cross-examination, Peggy stated that Petitioner did not have a good relationship with Eric and that Eric was not afraid of Petitioner.

Dr. Nancy Jones, a forensic pathologist, testified that she had performed approximately 800 to 900 autopsies on children. Dr. Jones stated that on January 7, 1994, she performed an autopsy on Eric and concluded that Eric died of "peritonitis, which was due to blunt abdominal trauma due to child abuse with multiple acute fractures due to blunt trauma contributing to his death."

Dr. Jones told the court that People's exhibit No. 5 showed bruises to Eric's head and face. There were older, yellow-brown bruises on his eyelids and fresh bruises on the right side of his head. Also, there were scratches associated with that along the side of his face. There were two red-purple bruises on the left side and the back of his head. The eyelid bruises were older than the other ones and the head bruises occurred close to the time of Eric's death. Dr. Jones stated that People's exhibit No. 6 showed the eyelid bruises more closely, and that

People's exhibit No. 7 and People's exhibit No. 8 showed more clearly the injuries to the right and left side of Eric's head.

Dr. Jones testified that People's exhibit No. 9 showed the bruise in front of Eric's right ear and the scratch associated with it. People's exhibit No. 10 showed the injuries depicted in People's exhibit No. 9 as well as a bruise behind Eric's right ear, and People's Exhibit No. 13 showed a bruise on Eric's left eye, around his umbilicus, on the left upper and lower quadrants of his abdomen, and on the left side of his scrotum. People's exhibit No. 15 showed a close-up view of Eric's abdominal and scrotal bruises, and People's exhibit No. 21 exhibited Eric's body from his feet upward and revealed older, yellow bruises on the left side of Eric's scrotum and fresh bruises on the right side of his scrotum. Dr. Jones testified that the newer bruises were one to two days old and that the older scrotal bruises would have been visible two to three days prior to Eric's death. People's exhibit No. 22, a picture of Eric's genitalia, showed how the bruises extended to Eric's penis.

Dr. Jones testified that People's exhibit No. 11 was of an internal examination of Eric's head. The healing hemorrhages in the photograph corresponded with the bruises on Eric's head. Dr. Jones explained that People's exhibit No. 12 showed new hemorrhages inside the back of Eric's head.

Dr. Jones testified that she also conducted an internal examination of Eric's torso. She found fresh hemorrhages at Eric's first and second ribs and at the side of the sixth, seventh, eighth, ninth, and tenth ribs. The first and second ribs were broken on both sides. The sixth, seventh, eighth, ninth, and tenth ribs were broken on the left side. In Dr. Jones' expert opinion, the breaks were fresh. Dr. Jones testified that People's exhibit No. 16 showed the injuries to Eric's rib cage.

As explained by Dr. Jones, People's exhibit No. 17 revealed the injury to Eric's intestine. People's exhibit No. 18 showed Eric's pelvic gutter and the intestinal hemorrhaging that extended inside his body. People's exhibit No. 19 showed Eric's lacerated liver, and People's exhibit No. 20 showed a hematoma inside his liver.

According to Dr. Jones' testimony, she discovered the presence of peritonitis, an inflammation or infection of the lining of the abdominal cavity, upon entering the abdominal cavity. The source of that infection was a damaged segment of intestine near the liver. The injury to the intestine caused a small laceration in the intestine so that intestinal contents came out into the abdominal cavity. Dr. Jones explained that there was a hemorrhage and a laceration on Eric's liver. Moreover, People's exhibit No. 23 showed Eric's right testicle after it had been removed from the scrotal sack and showed the extent of the hemorrhage in the testicle.

Dr. Jones stated that People's exhibit No. 24 exhibited hemorrhaging along Eric's spinal cord. She testified that this injury occurred within an hour of his death, and that two of Eric's vertebrae were broken within one hour of his death. When asked what amount of force would have been necessary to cause the broken vertebrae, Dr. Jones stated that the injury was consistent with a fall from a second story building or a traffic accident. Dr. Jones testified that Eric's injuries could not have been caused either by the play Petitioner described or by aggressive CPR techniques and that in her expert opinion, Eric's injuries were the result of abuse.

Over Petitioner's objection, the photographic exhibits were shown to the jury. Using an overhead projector, Dr. Jones again identified Eric's injuries that were depicted in the photographs.

Tina Duncan, Petitioner's mother, testified that she had seen Petitioner with Pamela's children. She testified that she never saw Petitioner discipline the children.

8

Petitioner testified that he and his cousin, Adam Robertson, moved into their apartment on October 1, 1993. He stated that after Pamela and her children moved in with them in November 1993, Petitioner's relationship with Adam deteriorated. Adam avoided interacting with Pamela's children. Petitioner testified that Adam and Pamela were friends when she moved in with them, but that their relationship also deteriorated and Pamela began to avoid Adam.

Petitioner told the court that Adam did not have a good relationship with Eric. Petitioner testified that Adam once came into the apartment angry after receiving parking tickets. Eric was in Adam's way, and Adam knocked Eric against the wall with his knee. Petitioner also testified that Adam argued with Jamie about a television program and ripped the head off of one of her dolls.

Petitioner testified that the games he played with Eric were designed to agitate Eric. He testified that he did not want Eric to be a "momma's boy."

Petitioner testified that Pamela kept her children up late at night so that they would sleep late and not disturb Petitioner. He also testified that Pamela would change Eric's diaper at 5:30 a.m. and at about 2:30 p.m. when she returned home so that Petitioner would never have to change a diaper.

Petitioner testified about Eric's fall from the truck and about the events on the day of Eric's death. Petitioner's testimony regarding these events was consistent with the statement he gave to Officer McCarthy. Petitioner disputed some of the words used in the written statements he gave to the police but acknowledged that he signed them.

The trial court denied Petitioner's motion for a directed verdict. The autopsy photographs were given to the jury to use during its deliberations. During the deliberations, the jury asked several questions of the court. In response to several of the questions, the trial court

ordered that Dr. Jones' testimony be transcribed in full and given to the jury. The jury found Petitioner guilty of first degree murder.

On June 1, 1994, the trial court denied Petitioner's motion for a new trial and sentenced Petitioner to 45 years of imprisonment. On June 2, 1994, the trial court denied Petitioner's motion to reconsider the sentence.

## PROCEDURAL HISTORY

Petitioner appealed his conviction and sentence to the Illinois Appellate Court raising the sole issue that the trial court improperly admitted the autopsy photographs into evidence and allowed the jury to view the photographs both during the pathologist's testimony and during the jury's deliberations. On May 31, 1996, the Illinois Appellate Court affirmed the conviction. Petitioner then filed a timely pro se petition for leave to appeal to the Illinois Supreme Court in which he raised the same substantive issue he presented to the Appellate Court. On October 2, 1996, the Illinois Supreme Court denied leave to appeal.

On March 31, 1997, Petitioner filed a petition for post-conviction relief pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, et seq., raising the following eight issues: 1) trial counsel was ineffective for failing to resign despite the existence of an actual conflict; 2) trial counsel was ineffective for failing to offer evidence likely to have produced an acquittal; 3) trial counsel was ineffective for submitting the general issue to an incompetent jury; 4) appellate counsel was ineffective for raising a single issue on appeal when other stronger issues existed; 5) trial counsel was ineffective for failing to suppress a video-taped statement; 6) trial counsel was ineffective for allowing a video confession to be played for the jury because playing the video was unreasonable and damaged defendant's case; 7) the trial court erred when

it prevented counsel from developing a witness's parole status and possible bias; and 8) trial counsel was ineffective for failing to preserve the matter of the witness's parole status and possible bias for review. The trial judge denied the petition for post-conviction relief on June 24, 1997 as frivolous and patently without merit.

Petitioner appealed the denial of his post-conviction petition to the Illinois Appellate Court, raising the following issues: 1) the trial court erred when it dismissed a verified, exhibit-laden post-conviction petition that asserted the ineffective assistance of trial and appellate counsel; 2) trial counsel was ineffective for failure to suppress post-arrest custodial statements; 3) trial and appellate counsel were ineffective for failing to raise the issue of police failure to inform Petitioner that his attorney was attempting to contact him; 4) trial counsel was ineffective for failure to adhere to Rule 3.7 of the Illinois Rules of Professional Conduct and withdraw from representation when an actual conflict existed; 5) trial counsel was ineffective for failure to suppress Petitioner's statements to the police when the police destroyed the interview notes after the investigative summary reports were prepared; 6) appellate counsel was ineffective for failure to raise the issue of the destroyed interview notes; 7) trial counsel was ineffective for failure to suppress post-arrest statements when the verdict was based solely on those post-arrest statements; and 8) appellate counsel was ineffective for failure to argue in the direct appeal that trial counsel was ineffective. On August 26, 1998, the Illinois Appellate Court affirmed the order of the trial court denying the petition. People v. Duncan, No. 2-97-0727 (August 26, 1998).

On October 2, 1998, Petitioner filed a pro se petition for leave to appeal the denial of his post-conviction petition to the Illinois Supreme Court, raising the following issues: 1) trial counsel was ineffective for failure to withdraw when an actual conflict existed; and 2) trial

counsel was ineffective for failure to offer evidence likely to have produced an acquittal. On December 2, 1998, the Illinois Supreme Court denied the petition for leave to appeal. People v. Duncan, No. 86313 (December 2, 1998).

On July 20, 1999, Petitioner filed in this Court the instant petition for writ of habeas corpus. In his petition, he raises numerous grounds for relief: 1) the police violated his right to due process when they failed to inform Petitioner that an attorney was attempting to contact him; 2) appellate counsel was ineffective for raising a single issue on appeal in the face of stronger issues, including (a) ineffective assistance of trial counsel regarding counsel's failure to suppress his post-arrest statements, failure to object to clearly inadmissible evidence, and failure to suppress a video-taped statement; (b) a claim concerning the legality of Petitioner's arrest; and (c) a claim that trial counsel's behavior in not suppressing a confession was objectively unreasonable; 3) trial counsel was ineffective for failing to offer evidence that would have produced an acquittal; 4) trial counsel was ineffective for submitting the general issue to a jury not competent to serve; 5) trial counsel was ineffective for refusing to withdraw when an actual conflict existed.

## DISCUSSION

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §2245(a); Moffat v. Gilmore, 113 F.3d 698, 702 (7th Cir. 1997); see also Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law"). The federal courts may not grant habeas relief under Section 2254 unless the state court's judgment

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

Before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts; and (2) fairly present any federal claims in state court first, or risk procedural default. See Chambers v. McCaughtry, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."); see also Bocian v. Godinez, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" McGowan v. Miller, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting Duncan v. Henry, 513 U.S. 364, 365 (1995)).

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." Wallace v. Duckworth, 778 F.2d 1215, 1219 (7th Cir. 1985).

In this case, exhaustion is not an issue. Respondent concedes in his Answer that Petitioner has exhausted his state court remedies for purposes of federal habeas review because he has no further avenues in state court through which to challenge his conviction. (Ans. at 4.) We now turn to the issue of procedural default.

## I.   Procedural Default

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. Jones v. Washington, 15 F.3d 671, 675 (7th Cir. 1994). Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, Coleman v. Thompson, 501 U.S. 722, 729-30 (1991), or when the petitioner fails to present a claim to the state courts at the time, and in the way required by the state. Hogan v. McBride, 74 F.3d 144, 146 (7th Cir. 1996). In Illinois, a habeas petitioner is required to raise all arguments before the Illinois Supreme Court, even though the Court has discretionary control over its docket. O'Sullivan v. Boerckel, 526 U.S. 838, 843 (1999).

In this case, Respondent contends that Petitioner has procedurally defaulted claims Three and Four. Specifically, Respondent argues that Petitioner defaulted on Claim Three because Petitioner failed to raise it on post-conviction review. As for Claim Four, Respondent also argues that Petitioner defaulted in his claim for failure to include it in his petition for leave to appeal to the Illinois Supreme Court. We will address each of these arguments in turn.

In order for Petitioner to preserve a claim for federal habeas review, he must provide the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845. In Illinois, "one complete round" is finished once the petitioner has presented the habeas claims, whether on direct appeal or on post-conviction appeal, at each stage of the appellate process, up through and including the Illinois Supreme Court. See id. at 847-48; see also White v. Godinez, 192 F.3d 607, 608 (7th Cir. 1999).

Petitioner argues in Claim Three of his habeas petition that trial counsel was ineffective for failing to offer evidence that would have produced an acquittal. Petitioner did not raise this issue in his post-conviction appeal to the Illinois Appellate Court. Accordingly, Claim Three is procedurally defaulted.

As to Claim Four, Respondent also claims that Petitioner defaulted because Petitioner failed to raise the issue on post-conviction review. We agree.

Petitioner asserts in Claim Four that trial counsel submitted the general issue of Petitioner's guilt to a jury not competent to serve. Specifically, Petitioner claims that counsel failed to ask during the venire whether any of the prospective jurors was a party to any action currently pending before the court. While the record discloses that Petitioner raised this issue in his first petition for post-conviction relief, Petitioner failed to raise this issue in his post-conviction appeal to the Illinois Appellate Court and in his post-conviction petition for leave to appeal with the Illinois Supreme Court. Accordingly, the claim that trial counsel was ineffective for submitting the general issue of Petitioner's guilt to a jury not competent to serve is also procedurally defaulted.

We note additionally that Petitioner has defaulted on Claim Two. Petitioner argues in Claim Two that he was denied effective assistance of appellate counsel. In Claim Two, Petitioner asserts that he was denied effective assistance of appellate counsel when appellate counsel raised a weak issue on appeal despite the existence of stronger issues. He alleges that appellate counsel raised the sole claim that the trial court erred in admitting autopsy photos and left far stronger issues "untouched." While Petitioner raised an ineffective assistance of appellate counsel claim in his post-conviction petition to the Circuit Court of Lake County, he failed to raise the claim in

his post-conviction petition for leave to appeal to the Illinois Supreme Court. Therefore, Claim Two also is procedurally defaulted.

A federal court may nonetheless address the merits of a procedurally defaulted claim if the petitioner can establish cause and prejudice that would excuse it or, alternatively, establish that he fits within the miscarriage of justice exception to the cause and prejudice rule. Coleman, 501 U.S. at 750 - 51; Wainwright v. Sykes, 433 U.S. 72,84 - 85 (1977). Beginning with the cause and prejudice standard, the Supreme Court has interpreted "cause" under this test to be something external to the petitioner which is both beyond his control and which cannot be fairly attributed to him. Murray v. Carrier, 477 U.S. 478, 488 (1986). In order to establish prejudice, the petitioner "must show not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 494.

Petitioner has failed to establish cause and prejudice in his petition. In fact, Petitioner has not argued that there were constitutional errors that prejudiced him, nor has he shown that there was cause for his failure to raise his defaulted claims. Petitioner has offered no reasons for his defaults. Moreover, he was able to raise and preserve his other claims in his petition for leave to appeal to the Illinois Supreme Court. Therefore, we find that Petitioner has not offered any external considerations that explain why he was able to raise some claims sufficiently, but not others.

Although Petitioner failed to show cause or prejudice for his procedural default, he may still overcome this forfeiture by showing that he fits within the "miscarriage of justice" exception. This exception is limited to those extraordinary cases in which the petitioner is actually innocent of the crime for which he is imprisoned. Bell v. Pierson, 276 F.3d 544, 551 (7th Cir. 2001).

Therefore, it requires a colorable claim of actual innocence, as opposed to legal innocence, coupled with an allegation of a constitutional claim. See Sawyer v. Whitley, 505 U.S. 333, 339 - 40 (1992). The miscarriage of justice exception applies only if the petitioner can demonstrate that it is more likely than not that no reasonable jury would have convicted him in the absence of the alleged defect in the state court proceedings. Schlup v. Delo, 513 U.S. 298, 327 (1995).

Petitioner generally asserts that, but for the error of his attorneys and the trial court, he would not have been convicted of murder. He fails to support these claims with any concrete evidence that demonstrates he is actually innocent of the murder. Absent any evidence of actual innocence, Petitioner cannot establish that, but for the alleged errors in his trial, it is more likely than not that no reasonable trier of fact would have convicted him of first degree murder. Thus, he presents nothing more than a claim of legal innocence that is immaterial to the present analysis. See Montgomery v. Meloy, 90 F.3d 1200, 1205 (7th Cir.), cert. denied, 519 U.S. 907 (1996). Accordingly, Petitioner's claims of ineffective assistance of appellate counsel, ineffective assistance of trial counsel for failing to offer evidence to produce an acquittal and submitting the issue of Petitioner's guilt to a jury not competent to serve, are barred from federal habeas review.

II.     Merits of the Claims Properly Presented

Based on the discussion above, Petitioner has properly preserved two of the claims in his habeas petition. The preserved claims are: 1) violation of due process; and 2) the ineffective assistance of trial counsel due to a conflict of interest. These claims were raised in the state trial court in a petition for post-conviction relief, in the post-conviction appeal to the Illinois Appellate Court and again in a post-conviction petition for leave to appeal to the Illinois Supreme Court. Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state

court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. §2254(2)(1). Under subsection (d)(2), habeas relief is possible if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), attempted to clarify the applicable standard of review within the meaning of section 2254. The Court noted that the act does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. <u>Id.</u> at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that "[the act] plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with the federal law or apply federal law in an unreasonable way." <u>Id.</u> at 376. Additionally, the Supreme Court determined that, in passing the statute, "Congress wished to curb delays, to prevent 'retrials' on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, [the statute] instructs them to do so." <u>Id.</u> Therefore, this Court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

Applying this standard to Claim One of Petitioner's petition, we must deny it. In Claim One, Petitioner claims that the failure of the police to advise Petitioner that his attorney was attempting to reach him was a violation of due process. Petitioner apparently contends that he was denied the right to counsel when the police failed to notify him that an attorney was attempting to contact him, thereby mandating confession-suppression. The test to determine whether the police inappropriately interfered with a suspect's right to counsel is whether the

suspect's ability to understand or comprehend his rights has been compromised by the lack of information that counsel is attempting to reach him.  Moran v. Burbine, 475 U.S. 412 (1986).

In this case, Petitioner has not made the requisite showing that the police prevented an attorney appointed or retained to represent Petitioner access to Petitioner.  The Illinois Appellate Court found that counsel had not been appointed or retained to represent Petitioner because counsel never asked to speak to Petitioner or mentioned that he represented Petitioner.  People v. Duncan, No. 2-97-0727 at 11 (August 26, 1998).  Indeed, counsel stated only that he was calling on behalf of Petitioner's mother.  Id.  Moreover, Petitioner has provided no further evidence to substantiate his claim that the police violated his constitutional rights.  Thus, we cannot say that the Illinois Appellate Court reached a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  Therefore, Claim One provides no basis for habeas relief.

Petitioner next claims that he was denied the effective assistance of counsel when his trial lawyer failed to withdraw in the face of an actual conflict between himself and Petitioner.  The standard for reviewing a claim of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Strickland sets forth a two-prong analysis for determining ineffectiveness of counsel: 1) a showing that counsel's performance was deficient; and 2) a showing that the deficient performance prejudiced the defendant.  Id. at 678.  In order to prevail on his claim of ineffectiveness under the first prong of the Strickland test, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness.  Id.  In reviewing the challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id.  To satisfy the prejudice prong of the Strickland test, Petitioner must show that there is a reasonable probability

19

that, but for counsel's unprofessional errors, the results of the proceeding would have been different. Id. This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. Rather, "[i]f it is easier to dispose of an ineffective assistance of counsel claim based on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." Id.

In this case, Petitioner has not met his burden of demonstrating that he was denied effective assistance of counsel regarding his lawyer's alleged failure to withdraw despite an actual conflict. Specifically, Petitioner contends that the police did not inform him that his attorney was trying to reach him and that trial counsel failed to move to suppress post-arrest statements because counsel would have been required to testify about the attempt to reach Petitioner. According to Petitioner, a conflict allegedly existed because counsel would be required to withdraw from the case if he were to testify as to the telephone call, thereby forfeiting any financial gain from representing Petitioner upon withdrawing from the case.

The Illinois Appellate Court's decision regarding this matter reflects ample consideration and appropriate application of the Strickland standard. The Appellate Court stated that "the defendant's petition contain[ed] no affidavit from his trial counsel as to what he would have testified had he been called as a witness on a motion to suppress, and thus, there is no indication as to whether trial counsel's testimony would have contradicted the investigator's narrative report of his telephone conversation with the police." People v. Duncan, No. 2-97-0727, August 26, 1998 at 13. The court determined that there was nothing in the record beyond "bare allegations" that "trial counsel's failure to file a motion to suppress was financially motivated." Id. at 14.

Therefore, the Appellate Court concluded that there was not unreasonable performance by trial counsel.

Likewise, Petitioner's attempt to make an ineffectiveness argument in this Court is unsuccessful. He fails to point to any United States Supreme Court precedent that supports his position, nor does he demonstrate that the Illinois Appellate Court failed to properly assess trial counsel's conduct pursuant to <u>Strickland</u>. Moreover, while Petitioner states that counsel failed to suppress custodial statements due to an actual conflict, nothing in the record indicates that there was an actual conflict. Petitioner has submitted nothing to indicate how counsel would have testified. Counsel's failure to withdraw, then, cannot be considered prejudicial to Petitioner, as Petitioner offers nothing to show that there is a reasonable likelihood that the outcome of the proceedings would have been different absent the attorney's performance. Petitioner fails to show that he would not have been convicted absent counsel's failure to withdraw. <u>United States v. Henry,</u> 933 F.2d 553, 561 (7th Cir. 1991). Thus, this Court cannot conclude that trial counsel's failure to withdraw fell below an objective standard of reasonableness and prejudiced Petitioner. Simply stated, Petitioner's statements that trial counsel's behavior was financially motivated are merely conclusory and insufficient to sustain his burden under §2254(d). Therefore, Petitioner's claim of ineffective assistance of trial counsel must fail.

## CONCLUSION

For the forgoing reasons, we deny the §2254 petition for a writ of habeas corpus brought by Petitioner Duncan. This is a final and appealable order. This case is terminated.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: *February 19, 2002*